**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **OFFICE OF CHILD ADVOCATE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:86-cv-00723-L** |
| | ) | |
| **PATRICIA MARTINEZ, in Her Capacity as Director of the Department of Children, Youth and Families,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO VACATE CONSENT DECREES AND DISMISS CASE WITHOUT PREJUDICE


Jametta O. Alston (Bar No. 3909)
CHILD ADVOCATE OF THE STATE OF RHODE ISLAND
272 W. Exchange St., Ste. 301
Providence, RI 02903
Tel.: (401) 222-1690
Fax: (401) 222-6652
jalston@gw.doa.state.ri.us

John William Dineen (Bar No. 2346)
305 South Main Street
Providence, RI 02903
Tel.: (401) 223-2397
Fax: (401) 223-2399
jwdineen1@yahoo.com

## Introduction

The Rhode Island Office of the Child Advocate filed this action in 1986 because the Rhode Island Department for Children and Their Families[1] ("the Department") was routinely taking children into its foster care custody and placing them in whichever beds happened to be available, without regard to the children's individual needs, and then moving the children from place to place on a night-to-night basis until more stable placements could be found. This harmful practice, commonly known as "night-to-night placement," violated the constitutional and statutory rights of those children, who had been taken into the Department's foster care custody because of allegations of abuse or neglect. Accordingly, the Rhode Island Office of the Child Advocate, as Plaintiff, brought this suit on behalf of children who were or would in the future be in the Department's custody. In the same action, which named the Director of the Department as the sole Defendant, Plaintiff also asserted constitutional and statutory claims based on Defendant's failure to provide children with needed services, planning, and suitable placements. In 1988, the parties entered into a consent decree aimed at abolishing night-to-night placements.

Twenty-one years, three contempt motions, and two amended consent decrees later, children in the Department's foster care custody continue to suffer from the practice of night-to-night placements. The Department placed 234 children in night-to-night placements in 2006, up from 50 in 2005 and 13 in 2004. This trend continues, with 90 night-to-night placements during the first four months of 2007. Far worse, however, the Department is now beset by a far wider set of systemic ills that have arisen since the consent decrees went into effect and which have taken firm root such that they currently harm or threaten to harm the almost 3,000 children in

[1] The Department for Children and Their Families was renamed the Department of Children, Youth and Families in 1991 and is referred to herein as "the Department."

Rhode Island foster care custody. These failings, and the serious damage they cause to children in foster care, were unknown or nonexistent in 1986 and therefore were unaddressed in this action's complaint and the subsequent consent decrees (collectively, "the Night-to-Night case"). Among the most egregious current problems:

- The Department fails to protect children from abuse and neglect in foster care;
- The Department fails to assess and address children's needs and fails to place them with families where their needs will be met and where they will be safe;
- The Department returns children to their parents without making a reasoned determination that the children will be safe and without identifying or providing services needed to ensure the children's safety
- The Department fails to engage in the planning necessary for children in their care to achieve permanency, causing many children to languish in foster care for years;
- The Department fails to maintain an adequate number of foster homes, instead placing and leaving children in institutions simply because nothing else is available;
- The Department assigns excessive caseloads to its caseworkers, making it impossible for them to visit the children in the Department's custody; and,
- The Department places children in unlicensed homes.

The existing consent decrees derive from a 21-year-old complaint that, as a practical matter, could not have anticipated these serious ills that now harm children and shackle the Department as it fails in its vital mission to protect Rhode Island's most vulnerable citizens. For this reason, in furtherance of her statutory mandate to ensure the best interests of the 3,000 children who are in Rhode Island's foster care custody, Rhode Island Child Advocate Jametta O. Alston is now filing a new and comprehensive class action against the relevant current state officials to remedy the above problems and related ills as they exist *today*. Rhode Island's child welfare system is wholly broken, and the Rhode Island Child Advocate has concluded that the night-to-night problem is merely one manifestation of larger problems that have only come to

light over time, and that the practice of night-to-night placement can only be eliminated by addressing the system's problems in their entirety. Therefore, rather than continuing the effort to fix a single piece of the system in isolation—that is, night-to-night placements—the Rhode Island Office of the Child Advocate has determined that a new approach is needed. The new class action is necessary because the narrow scope of the complaint and consent decrees in the present action precludes remedying the full range of harms that Rhode Island's foster children currently suffer.

In the interests of equity, justice, and judicial economy, Plaintiff therefore respectfully moves this Court, pursuant to Rule 60(b)(5), to vacate the consent decree as amended and, pursuant to Rule 41(a)(2), to dismiss the instant action without prejudice. The requested vacatur and dismissal will make it possible to address the full scope of present-day harms to children in Defendant's foster care custody in the new class action.

## The History of This Action

### The Complaint

In 1986, the Rhode Island Office of the Child Advocate brought this action for injunctive and declaratory relief in accordance with its statutory authority to take formal legal action to secure the rights of children in Defendant's foster care custody. (Compl. ¶¶ 1, 9 (citing R.I. Gen. Laws § 42-73-7(6)).) Based on the facts and circumstances as they existed in 1986, the complaint charged Defendant with institutionalizing the practice of placing children in night-to-night placements and in inadequate shelter care placements, causing these children "to be in effect homeless," in violation of the children's constitutionally guaranteed rights to freedom from harm and equal protection of the law. (Compl. ¶ 2.) The complaint also charged Defendant with failing to deliver preventive services to children residing in certain parts of the state, in violation

of those children's constitutionally guaranteed rights to family integrity and equal protection of the laws. (Compl. ¶ 3.) Finally, the complaint charged Defendant with failing to provide adequate case plans, preventive and reunification services, suitable placements, and proper discharge planning to children in Defendant's custody, in violation of those children's statutory rights guaranteed by the Adoption Assistance and Child Welfare Act of 1980 (AACWA). (Compl. ¶ 4.)

The complaint sought a preliminary and permanent injunction against: harming children in the manner charged in the complaint; treating children differently as to their access to suitable shelter and preventive services; withholding preventive services to the detriment children's rights to family integrity; and failing to comply with the case planning, preventive services, and discharge planning provisions of AACWA. (Compl. § IX(1).) The complaint also sought a declaration that Defendant had violated children's civil rights, federal constitutional rights, and rights under AACWA, as described therein; legal costs; and such additional or alternative relief as the Court saw fit. (Compl. § IX(2)-(4).)

**The 1988 Consent Decree**

This action was resolved without trial by entry of a consent decree on September 22, 1988. To help address the harm that night-to-night placements caused, the original consent decree required Defendant to take several specific steps to extend preventive services statewide, to expand the number of available placements for children and youth, and to spend $1,646,000 for this purpose. (Consent Decree ¶¶ 3–8.) Upon completion of these steps, Defendant was required to cease placing children for more than four consecutive nights in night-to-night placements. (Consent Decree ¶¶ 1–2.) In the interim, because night-to-night placements disrupted children's education and harmed their performance in school, Defendant was required

to make all reasonable efforts to provide for the educational needs of children in Defendant's care. (Consent Decree ¶ 2.)

**The 1989 Amended Consent Decree**

A year after the consent decree went into effect, Plaintiff moved this Court to adjudge Defendant in contempt of the decree. That motion led to entry of an amended consent decree, which went into effect on October 20, 1989.[2] The amended consent decree required Defendant to cease placing children for more than three (as opposed to four) consecutive nights in night-to-night placements as of November 30, 1989, and to cease night-to-night placements of any length by June 30, 1990, except on an emergency basis. (Am. Consent Decree ¶¶ 3–5.) Defendant was also required to cease placing children in foster homes or congregate care facilities if doing so would exceed those placements' licensed capacity. (Am. Consent Decree ¶ 4.) In the event that any emergency night-to-night placement exceeded two days, Defendant was required to give immediate notice to the Rhode Island Office of the Child Advocate and to the child's guardian ad litem. (Am. Consent Decree ¶ 5.) The amended consent decree required Defendant to take certain steps to expand the number of placements for children and youth, to expend one million dollars for this purpose, and to continue making all reasonable efforts to provide for the educational needs of children in its care. (Am. Consent Decree ¶¶ 6–8, 10.) Compliance with these commitments would be monitored by the Rhode Island Office of the Child Advocate by way of specific reporting requirements imposed on Defendant. (Am. Consent Decree ¶ 9.)

---

[2] The amended consent decree superseded the provisions of the original consent decree that it modified; the unmodified provisions of the original consent decree remained in effect. (Am. Consent Decree 1.)

**The 2001 Second Amended Consent Decree**

Defendant's compliance with the consent decree as amended was inconsistent throughout the next decade. On July 19, 2001, after months of fruitless negotiation and with high numbers of children in prohibited night-to-night placements, the Rhode Island Office of Child Advocate filed a second contempt motion against Defendant. That led to entry of a second amended consent decree on August 27, 2001.[3] The second amended consent decree reiterated that night-to-night placements of any length of time were prohibited, except in unusual placement emergencies, for which prior administrative approval would now be required. (Second Am. Consent Decree ¶¶ 3–4.) In recognition of the manifest disruption of children's education that night-to-night placements continued to cause, the earlier decrees' requirement that Defendant make reasonable efforts to meet children's educational needs was replaced by a requirement that any child who was placed in an emergency night-to-night placement would thereafter be transported to and from his or her school by the Department for the duration of the night-to-night placement. (Second Am. Consent Decree ¶ 5.) Other new provisions required Defendant to take certain steps to prevent unplanned discharges of children from care, to determine appropriate service plans and improve services for adolescents, and to expand placement options, especially for adolescents. (Second Am. Consent Decree ¶¶ 6-11.) The monitoring scheme from the first amended decree was reaffirmed, and Defendant committed to providing a written compliance and performance report to the Rhode Island Office of the Child Advocate within six months. (Second Am. Consent Decree ¶¶ 14, 16.) Finally, the second amended consent decree required the parties to meet and confer in good faith to attempt to resolve any unforeseen problems that

[3] Like the previous amendment, the second amended consent decree superseded the provisions of the original consent decree (as amended) that it modified and the unmodified provisions remained in effect. (Second Am. Consent Decree at 2.)

might arise, and it permitted either party to move to modify or vacate the provisions of the consent decree as amended, as provided in the Federal Rules and case law. (Second Am. Consent Decree ¶¶ 16, 19.)

**Defendant's Ongoing Noncompliance and**
**Efforts to Evade its Duties under the Consent Decree**

Less than nine months after the enactment of the Second Amended Consent Decree, on May 2, 2002, the Rhode Island Office of Child Advocate again moved to adjudge Defendant in contempt. In response, Defendant moved this Court to relieve it of its obligations under the consent decrees, arguing that the Rhode Island Office of Child Advocate lacked standing to be before this Court, that Defendant enjoyed sovereign immunity, and that this Court should cede jurisdiction over the action in the name of federalism. *Id.* at 181. This Court denied Defendant's motion in its entirety. *Office of Child Advocate v. Lindgren*, 296 F. Supp. 2d 178, 195 (D.R.I. 2004). Plaintiff subsequently withdrew its contempt motion with the consent decrees remaining in effect.

Instead of complying with its obligations under the three consent decrees, however, Defendant has made increasing use of night-to-night placements since 2004. After placing 13 children in night-to-night placements in 2004, Defendant placed 50 children in such placements the following year, a 285-percent increase. And from 2005 to 2006, Defendant's use of night-to-night placements increased by 368 percent, reaching 234 children by the end of last year. During the first four months of 2007, there were 90 night-to-night placements. If night-to-night placements continue at this rate, there will be 270 such placements this year.

**After Two Decades, Circumstances for the Children in**
**Defendant's Foster Care Custody Have Only Worsened**

The plight of children in Defendant's foster care custody has changed—in dramatic, fundamental ways—since the complaint in this action was filed in 1986 and since the consent decrees following that complaint went into effect. New systemic and unconstitutional harms to children have come to the fore and must be redressed without delay.

- In five of the six years from 2000 through 2005, children in Defendant's foster care custody suffered neglect or maltreatment *while in state custody* at rates higher than in any other state in the country; in the sixth year, the rate of neglect or maltreatment of foster children in Rhode Island was the second worst in the nation. The rate of abuse or neglect of children in Defendant's foster care custody has been so high that foster children in Rhode Island have been statistically more likely to suffer such maltreatment than their peers in the general population.
- More than 15 percent of the children entering Rhode Island foster care in the first quarter of 2006, the most recent period for which data is available, had been in foster care less than a year earlier. This means that these children had been returned by the State to their parents, only to be abused or neglected by them again and returned to state custody.
- Defendant assigns staggering caseloads to the caseworkers who are responsible for visiting children in foster care, overseeing their receipt of services, and making sure that they are safe and that their needs are met. These caseloads have exceeded professional standards by a factor of three, preventing caseworkers from making over 60 percent of their required monthly visits to children and 66 percent of their required monthly visits to these children's parents. Without visiting foster

children on a regular basis, caseworkers cannot ensure that they are safe. Without visiting foster children's parents, caseworkers cannot make informed decisions about whether children should be reunified with their parents.

- As of May 2007, 233 children in the Department's legal custody were living in unlicensed foster homes. This represents approximately 10 percent of the children in Rhode Island's foster care population. Making sure that foster homes where children are placed are properly licensed is essential to keeping children safe. Licensure ensures, for example, that there are no adults in the home who have been convicted of crimes involving persons, children, weapons, or illegal substance abuse; that there are no adults in the home who have been involved in substantiated incidents of child abuse or neglect or have been in Juvenile Corrections; that the home complies with fire codes and is fit for human habitation; and that the foster parents have received training in caring for children in foster care.
- 35 to 40 percent of children in Defendant's foster care custody live in emergency shelters, group homes, and institutional settings. In contrast, only 19 percent of foster children nationally live in these sorts of settings. More alarming still, in 2004, the most recent year for which data are available, 18.9 percent of children in Defendant's foster care custody below the age of 12 were living in group and institutional settings, more than twice the national median of 8.6 percent. Many of these placements violate federal law and accepted standards of social work practice, which require that foster children be placed in the least restrictive, most family-like setting suited to their needs. Further, congregate care settings are not

> only more expensive than family foster care, but their effectiveness at meeting children's mental health and behavioral needs is a matter of debate in the field of child welfare. Children placed in congregate care are less likely to maintain connections with their biological families, are less likely to be adopted, and are more likely to re-enter foster care following reunification.[4]

Almost all of these dangerous and unlawful circumstances that harm children lie outside the scope of this action and the consent decrees. Others may overlap with some matters within the ambit of this action and its consent decrees. All arise from Defendant's entrenched policies and practices that can only be corrected through systemic reforms. For example, the array of placement resources should be expanded and the licensing process overhauled; caseworker and foster parent training should be modernized; supervision—and, where appropriate, investigation—of foster care providers should be improved to ensure that foster children are safe and that they are not being abused, neglected, or subject to corporal punishment while in state custody; planning and placement guidelines that address foster children's individual needs should be fully implemented; supportive services should be available and provided to ensure the success of appropriate permanency goals (e.g., reunification, adoption, or preparation for independent living); caseloads should be capped at levels that allow caseworkers to perform their work in accordance with professional standards, including making visits that are critical to

---

[4] *See, e.g.*, Richard P. Barth, *Institutions vs. Foster Homes: The Empirical Base for a Century of Action* (2002); Stephen Budde et al., *Residential Care in Illinois: Trends and Alternatives* (2004); Mimi V. Chapman et al., *Children's Voices: The Perceptions of Children in Foster Care*, 74 Am. J. Orthopsychiatry 293–304 (2004); James K. Whittaker & Anthony N. Maluccio, *Rethinking "Child Placement": A Reflective Essay*, 76 Soc. Serv. Rev. 108–34 (2002); Fred H. Wulczyn et al., *Foster Care Dynamics 1983-1998* (2000); Deborah A. Frank, *Infants and Young Children in Orphanages: One View From Pediatrics and Child Psychiatry*, 97 Pediatrics 569-578 (1996); Brenda Jones Harden, *Congregate Care for Infants and Toddlers: Shedding New Light on an Old Question*, 23 Infant Mental Health Journal 476-495 (2002); Jill Duerr Berrick et al., Group Care and Young Children, 71 Soc. Serv. Rev. 257-273 (1997).

ensuring foster children's safety; caseworker supervision should be improved; guidelines should be put in place and resources must be coordinated to ensure that foster children's medical, dental, mental health, and educational needs are met; and the Department should fully claim all available federal funding.

## **Argument**

Under Rule 60(b)(5) of the Federal Rules of Civil Procedure, it is appropriate to vacate a judgment when "it is no longer equitable that the judgment should have prospective application." The consent decrees in this action are "the judgment of the Court with respect to the merits of the instant case" (Second Am. Consent Decree ¶ 18), and Rule 60(b)(5) permits their vacatur. The parties contemplated this very possibility, agreeing in the Second Amended Consent Decree that "any party may move to modify or vacate the provisions of this Consent Decree, as provided in the Federal Rules of Civil Procedure and applicable case law." (Second Am. Consent Decree ¶ 19.) Because, as shown below, prospective application of the consent decrees would no longer be equitable, this Court should vacate the consent decrees.

This Court should also dismiss this action without prejudice. Rule 41(a)(2) provides that a plaintiff seeking voluntary dismissal of an action after an answer has been filed must obtain a court order. "Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice." Fed. R. Civ. P. 41(a)(2) (2006). The issuing court may attach "such terms and conditions as the court deems proper." Fed. R. Civ. P. 41(a)(2) (2006). Because, as demonstrated below, Defendant would not be prejudiced by dismissal, the Court should order dismissal without prejudice.

## I. THE CONSENT DECREES DO NOT ADDRESS CURRENT PROBLEMS IN THE RHODE ISLAND CHILD WELFARE SYSTEM

The consent decree, entered nearly two decades ago and amended twice, does not adequately protect children in Defendant's foster care custody from the harms that currently result from Defendant's violation of their constitutional and statutory rights, because of the new and egregious problems that have surfaced in recent years that go beyond the scope of the present decrees. The limited reach of the consent decrees, with their focus on night-to-night placements, does not correspond to today's changed factual landscape. New, urgent problems lie beyond the reach of the consent decrees and render them ineffectual in providing meaningful protection from the current problems that harm children in foster care. Among these problems are rampant abuse and neglect of children in Defendant's protective custody, cycling of children in and out of foster care as a result of improperly managed efforts at reunification, placing large numbers of foster children in inappropriate and unlicensed placements, institutionalizing children in unsuitable congregate care facilities, conducting minimal and ineffectual permanency planning, and assigning staggering caseloads to social caseworkers that make basic actions to ensure children's safety and well-being impossible. At the same time, the problem of night-to-night placements persists, despite Defendant's having had far more time than the parties ever could have envisioned to attempt to address it. Because the consent decrees have failed to achieve their purpose and, more importantly, because they provide no remedy to the majority of harms that Defendant currently creates for children in its foster care custody, their prospective application is no longer equitable.

The First Circuit has recognized that Rule 60(b)(5) is particularly relevant to consent decrees in matters "such as institutional reform litigation, where, because the decree involves the long-term supervision of changing conduct or conditions, its prospective requirements may be

rendered inappropriate by unforeseen changes in circumstance subsequent to the entry of the order." *Paul Revere Variable Annuity Ins. Co. v. Zang*, 248 F.3d 1, 7 (1st Cir. 2001) (citing *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 379 (1992)). That is precisely the case here—circumstances have changed significantly since the consent decree was entered and even since it was last amended such that its prospective application is no longer appropriate. Accordingly, this Court should now vacate the consent decrees and, pursuant to Rule 41(a)(2), dismiss this action without prejudice.

## II. BECAUSE THE NEW CLASS ACTION THAT IS BEING FILED SEEKS COMPREHENSIVE REFORM, THE CURRENT CASE SHOULD BE DISMISSED IN THE INTEREST OF JUDICIAL ECONOMY

For reasons of equity, judicial economy, and practicality, the consent decrees should be vacated and this action dismissed without prejudice so that the harms that children in Defendant's foster care custody continue to suffer may be addressed in a single, coherent class action against Defendant and additional parties. The harms that foster children suffer as a direct result of Defendant's acts and omissions are systemic in nature. Ending Defendant's ongoing violations of the constitutional and statutory rights of foster children in Defendant's custody can be accomplished most coherently and efficiently by effecting systemic reform of the child welfare system that Defendant operates. To that end, contemporaneous with the filing of this motion, the Rhode Island Office of Child Advocate is bringing a new class action against Defendant and additional parties, seeking prospective injunctive relief to effect comprehensive reform of the dysfunctional child welfare system that Defendant administers.

The new class action addresses the broad range of Defendant's harmful conduct, acts, and omissions that now damage children in Defendant's foster care custody, in violation of their

constitutional and statutory rights. The class action seeks relief that addresses the current constitutional and statutory violations enumerated above.

The Night-to-Night case addresses none of these urgent problems, which afflict the most vulnerable members of our society. The new class action seeks to remedy the broad range of injuries that children suffer now. As the harms outlined above demonstrate, the factual landscape in which the Night-to-Night case was set has changed significantly in the intervening years since it was filed. It is more efficient to address those harms in one civil action, not two. Moreover, should a remedy ultimately be set in the new class action, it will be more efficient to implement a unified set of reforms rather than attempt to coordinate two separate reform schemes. Therefore, this Court should vacate the consent decrees and dismiss the Night-to-Night case without prejudice.

## III. VACATING THE CONSENT DECREES AND DISMISSING THIS ACTION WITHOUT PREJUDICE WILL NOT CAUSE UNFAIR PREJUDICE TO DEFENDANT

In weighing the equities between keeping the Night-to-Night case in place and granting Plaintiff's Rule 60(b) motion to vacate and dismiss, it is proper to consider the potential for unfair prejudice to Defendant. *Gonzalez Rucci v. U.S. Immigration and Naturalization Serv.*, 405 F.3d 45, 48 (1st Cir. 2005). In addition, the primary consideration in deciding a Rule 41(a)(2) motion for an order of dismissal is whether the defendant will be prejudiced by dismissal. "The basic purpose of Rule 41(a)(2) is to freely permit the plaintiff, with court approval, to voluntarily dismiss an action so long as no other party will be prejudiced." *Puerto Rico Mar. Shipping Auth. v. Leith*, 668 F.2d 46, 50 (1st Cir. 1981) (quoting *LeCompte v. Mr. Chip, Inc.*, 528 F.2d 601, 604 (5th Cir. 1976)); *accord Doe v. Urohealth Sys., Inc.*, 216 F.3d 157, 160 (1st Cir. 2000) (quoting).

Defendant here will not suffer any unfair prejudice from vacatur of the consent decrees and dismissal of the present action without prejudice. In the first place, five years ago, Defendant itself moved this Court to vacate the consent decree under Rule 60(b)(4) or to dismiss under Rule 12(b)(1). *Office of Child Advocate*, 296 F. Supp. 2d at 182-83. Having sought vacatur and dismissal itself not long ago—without specifying that it was seeking dismissal *with* prejudice—Defendant cannot reasonably argue that the same relief today would be unfairly prejudicial. Indeed, having the child welfare system's systematic and serious problems addressed in one lawsuit, rather than two, should be more efficient not only for the Court but for the parties, including the Defendant.

**Conclusion**

For the above reasons, in the interests of equity, justice, and judicial economy, this Court should now vacate the consent decree as amended, pursuant to Rule 60(b)(5), and dismiss this action without prejudice, pursuant to Rule 41(a)(2).

Respectfully submitted,

CHILD ADVOCATE OF THE STATE OF RHODE ISLAND

By its Attorneys,

/s/ Jametta O. Alston

JAMETTA O. ALSTON (Bar No. 3909)
CHILD ADVOCATE OF THE STATE OF RHODE ISLAND
272 W. Exchange St., Ste. 301
Providence, RI 02903
Tel. (401) 222-1690
Fax (401) 222-6652
jalston@gw.doa.state.ri.us

_/s/ John Dineen_______________________
JOHN WILLIAM DINEEN (Bar No. 2346)
305 S. Main St.
Providence, RI 02903
Tel. (401) 223-2397
Fax (401) 223-2399
jwdineen1@yahoo.com

**CERTIFICATE OF SERVICE**

I certify that on June 28, 2007, I electronically filed the foregoing document with the Clerk of the Court, which sent notification of the filing to the following:

Kevin J. Aucoin
Legal Department
Department of Children, Youth and Families
101 Friendship St.
Providence, RI 02903
(401) 528-3570
Fax: (401) 528-3566
Email: kevin.aucoin@dcyf.ri.gov

Thomas J. Corrigan, Jr.
Legal Department
Department of Children Youth and Families
101 Friendship St.
Providence, RI 02903
(401) 528-3568
Fax: (401) 528-3566
Email: thomas.corrigan@dcyf.ri.gov

James Lee
Department of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
Email: jlee@riag.ri.gov

BY: ______/s/ John Dineen_______
One of Plaintiffs' Attorneys